THOMAS G. CHAMBERLAIN et al., as Successor Trustees under the Will of SAMUEL L. CLEMENS, Deceased, et al., Appellants, *v.* LEW D. FELDMAN et al., Respondents.

First Department, December 20, 1948.

*A. S Andrews* for appellants.

*Allan Hyman* for respondents.

SHIENTAG, J. The estate of the late Samuel L. Clemens (Mark Twain) brings this action to enjoin publication of an unpublished manuscript written by Mark Twain. The theory of the complaint is that the defendants have no title to the literary property in the manuscript as distinguished from the physical ownership of the autographed manuscript.

The record shows that the manuscript was written in 1876, was submitted to William Dean Howells, editor of the *Atlantic Monthly,* for publication, and was rejected by that publication. The manuscript was not a finished manuscript but was an outline of a plot which could be developed by different authors, each in his own manner. The idea was that these different stories could ultimately be collected in one volume and profitably sold. Correspondence at the time makes it clear that the author never expected to publish his manuscript in the form that it then was, and that future action would depend upon the co-operation of well-known American novelists, or possibly English authors, in a combined plan.

Nothing further is known as to the disposition of the manuscript. It was not found among Mark Twain's papers in 1910, at the time of his death. The evidence shows that he was very particular about his unpublished manuscripts up to the time of his death. This state of facts is quite sufficient to justify the holding that no intentional transfer of the manuscript for the purpose of publishing it was ever made by the author.

Defendants offered two possible suggestions as to how this manuscript got into circulation. The first is that the author gave the manuscript to his cousin, Dr. James Ross Clemens of St. Louis, in London in 1897, in exchange for a loan. It turns out that this was an erroneous conjecture by a Mark Twain

expert, who confused Dr. James Ross Clemens, Mark Twain's cousin, with the Dr. James Brentano Clemens, a New York collector of manuscripts, in whose possession this manuscript was found at the time of his death in 1930. There is no factual basis whatever for the claim that title to this manuscript comes from Mark Twain's cousin.

The other possible suggestion is that, for reasons unknown, the manuscript was never returned to Mark Twain, but came into the hands of a man named Ayer who consigned it to Dodd Mead & Company in 1910, for $600. The suggestion is that Dr. James Brentano Clemens bought the manuscript from Dodd Mead & Company. The difficulty with this evidence, which was offered but was properly excluded, is that there is no way to identify a manuscript referred to in the Ayer consignment memorandum with the manuscript finally purchased by Dr. James Brentano Clemens. Even if we were to believe that the manuscript came to Dr. Clemens in this way, it would not help the defendant, since the most that would be transferred would be the property in the autographed manuscript as a result of years of open and notorious possession by Dr. Clemens. But since the literary property in a manuscript is and always has been separate from the actual manuscript itself, that is, something in the nature of a chose in action, the right to publish may not be inferred from the mere possession of the manuscript under these circumstances.

Defendant Feldman bought the manuscript at the sale of Dr. Clemens' manuscripts in 1945. This was an auction sale, and the estate sold the manuscript only, merely stating that it was thought that the manuscript had never been published. While it is true that the defendant Feldman has purchased all the rights which Dr. Clemens had in the manuscript the estate of Dr. Clemens did not purport to sell the literary property.

As above stated, literary rights have always been held to be separable from the manuscript itself. (*Stevens* v. *Cady*, 14 How. [U. S.] 528, 530, and cases there cited; *Macklin* v. *Richardson*, 7 E. R. C. 66; *Palmer* v. *De Witt*, 47 N. Y. 532.) In the recent case of *Pushman* v. *N. Y. Graphic Society* (287 N. Y. 302, 307) it was said: " We are, of course, concerned here with the so-called common law copyright, not statutory copyright. This common law copyright is sometimes called the right of first publication. There is no question but that it is a different and independent right from the usual right

of ownership of an article of personal property. (*Stevens* v. *Cady*, 14 How. [U. S.] 528, 530.) The Stevens case quotes Lord MANSFIELD as saying it is ' a property in notion, and has no corporeal tangible substance.' There is no doubt that in New York State the separate common law copyright or control of the right to reproduce belongs to the artist or author until disposed of by him and will be protected by the courts (*Oertel* v. *Wood*, 40 How. Prac. 10; *Howitt* v. *Street & Smith Publications, Inc.*, 276 N. Y. 345, 350). Such is the holding of the case of *Werckmeister* v. *Springer Lithographing Co.* (63 Fed. Rep. 808), which says (at p. 811) that the painting itself may be transferred without a transfer of the common law rights of publishing or restricting publication, and that the ownership of the painting itself does not necessarily carry with it the common law copyright. The same thing is held in *Caliga* v. *Inter Ocean Newspaper Co.* (157 Fed. Rep. 186, 188; affd. 215 U. S. 182).''

In the *Pushman* case (*supra*) a painting had been sold by the artist and the court found an intention to transfer all rights of reproduction in the picture from the fact that the artist gave an unconditional bill of sale. In the present case we have no such situation, and it is impossible to spell out from the known conduct of the author that there was a voluntary transfer of the manuscript to anyone which carried with it the privilege of publication. In other words, there is no basis for presuming or inferring that Mark Twain himself transferred the manuscript, or that, assuming such a transfer, there should be a further inference that it was without reservation and that all intermediate transfers into the possession of Dr. James Brentano Clemens carried with it similar transfers of the literary property without reservation.

The judgment and findings excepted to should be reversed and new findings made in accordance with this opinion, without costs to the appellants, and judgment should be directed in favor of the plaintiffs for the relief demanded in the complaint.

PECK, P. J., and VAN VOORHIS, J., concur; GLENNON and COHN, JJ., dissent and vote to affirm.

Judgment and findings excepted to are reversed and new findings should be made in accordance with opinion, without costs to the appellants, and judgment directed in favor of the plaintiffs for the relief demanded in the complaint.

Settle order on notice.